May it please the Court. Symmetry and asymmetry are inherently terms that require a frame of reference. If I'm talking to an evolutionary biologist and they're discussing the symmetry of an animal as it's evolved, they're talking about a center line bisecting from nose to tail. If I'm talking to an architect about the symmetry of Monticello, they're talking about a line bisecting the facade. No one is under the illusion when we say an animal or if you're talking to a modeling agent, a model's face is symmetrical, no one's saying it's symmetrical top to bottom or at an angle. We have to know what frame of reference we're talking about. Judge White, we believe, made two errors, a primary error and a secondary error in this case. The primary error is that he privileged SENORX's notion of asymmetry over HOLOGIC's notion of asymmetry. Now what do I mean by that? Every single reference where it is specific as to what the frame of reference is for symmetry says, with respect to the longitudinal axis of the lumen, of the catheter in which the radiation source is placed. What about figure 3? Your Honor, and this is an important issue that I was about to get to, in figure 3 we have to distinguish, the secondary error is that there are two different notions of symmetry in the claim, symmetry of the dose and symmetry of the source. Figure 3A shows an asymmetric dose, not necessarily. If you imagine a Venn diagram or a box, symmetric, asymmetric dose, symmetric, asymmetric source, all four of those boxes can be filled in theoretically. And that's the secondary error Judge White made, is assuming that one necessarily entails the other. For example, you can have doses of different intensities and so the same configuration of doses, as plots on a chart, can result in, excuse me, sources and plots on a chart, can result in different shaped doses depending on the intensity of each of the radiation sources. So what these claims call for is both an asymmetric source, or sources depending on the claim, and an asymmetric dose. And the court's construction of asymmetric dose, Judge White suggested followed a fortiori from his construction of asymmetric, asymmetric source followed a fortiori from his construction of asymmetric dose, and as a matter of physics that's not the case. But every instance in which the claim is clear, or the discussion says what the frame of reference is, it's with the longitudinal axis. In other words, we can fold it over and see whether it's symmetrical. Well, the problem I have is that you say it's clear, but it doesn't say so. And you've got two other claims, I guess it's two and six, in which it explicitly does say so, speaks about the longitudinal axis, and therefore one would think that if the patentee intended to include that in claims one and eight, he would have included it explicitly as it was done in two and six. I would agree with you completely, Your Honor. If there were discussions in the specification of both kinds of symmetry. What difference does it make whether there's discussion in the specification of both types of symmetry? If I have one claim and a patent says they should use a board that's 12 inches wide, and another claim says it should use a board, it seems to me you'd be hard-pressed to say, well, you should treat a board as meaning a board that's 12 inches wide, where the board does not say so, the claim does not say so, but in another claim it's said so explicitly. Your Honor, the Kraft Foods case is directly on point and is in contradistinction to the hypothetical you just gave. There, every discussion in the specification in the file wrapper suggested that in the case of Borge or the sides of the box had to be relatively stiff. There were some times where they didn't make it clear that it was relatively stiff, and the court said there, look, we know every time you're talking about this it's relatively stiff, so we're not going to assume, we're not going to assume that because you didn't mention it here that you must have meant something different. There was no reason why we, this is not a situation where there's a piece in the record, there's testimony, say, from one of skill in the art that says, we would normally assume symmetry means full 360 up, down, top, bottom symmetry, but there are exceptions. That doesn't exist in this record. There isn't anything in the specification that says there are multiple notions of symmetry and we're going to use A, B, and C at different times for different purposes. There's not even plain meaning discussions, and frankly, the two choices of symmetry are not just this way or in a complete sphere. For example, a soup can is symmetrical in two ways, but not if you fold a catty corner if you get what I'm trying to depict there. The point is that symmetry here is only discussed in one way in the specification. Every time there's clarity, and that's most of the time, it says with respect to longitudinal axis. There are a few times in the specification where it doesn't say with respect to the longitudinal axis, just like there are times in the claims, but there is never a circumstance, not one in the spec, the file wrapper, or the claims where it says symmetry is with respect to anything other than the longitudinal axis. So we have some affirmative statements, some neutral statements, but no contradistinctive statements. So why then? You were going to talk about figure three, and I think you got off the track. Yes, Your Honor. And why doesn't that disclose symmetry with respect to the longitudinal axis? It does in one direction. It doesn't in the other. And what that results, and in fact, that's exactly what the specification says, is it's symmetrical. If you look at figure 3A, and pardon the points of the compass, it results in symmetrical east to west and north to south, but the overall figure is not symmetrical. In other words, it's a three-dimensional. That's exactly right. That's exactly right. So the question we're asking is, if you go out at any point along the longitudinal axis and measure, am I going to get a uniform measurement, or roughly uniform, given that we're talking about the human body here? If the answer is yes, you are symmetrical. If the answer is no, you are asymmetrical. Figure 3A depicts an asymmetrical profile because you see it's narrower here than it is here. And that's exactly what the patent says when discussing figure 3 and figure 3A, although it breaks it up into component parts. It says, this is symmetrical, but not with this. So as I suggested, the primary error here is the assumption that in the face of lack of a qualifier, that we're going to default to a notion of symmetry that is nowhere mentioned. Nowhere. There's no expert testimony that it's the default. There's no dictionary definition. In other words, this is another one of those cases that we see very frequently, where the claim is susceptible to a little broader interpretation. But if you look at the specification, you're saying it is clear that there's only one interpretation. That's exactly right. And to that extent, I would suggest that had the Rolls-Royce case come out, and much to my chagrin, the Rolls-Royce came down literally when our opening brief were at the printer, or else we would have discussed it in our opening brief. But had the Rolls-Royce case come down prior to this Barkman ruling, I would suggest that Judge White would have framed the issue differently, and that we would have framed it differently for his honor. And we would have said, look, if the court's not familiar with that case, it talked about translation forward. And it recognized there were two different potential notions of forward, with reference to the propellers of an aircraft engine. And it said, well, one meaning of forward is the direction the airplane's going, and the other meaning is the direction the propeller is spinning. And both are perfectly legitimate meanings of forward. And what the defendant said, the person arguing for a broad interpretation to get an invalidity ruling, said is, well, forward must mean both, because it's not clear in the claim. And what the court said in that instance is no. In light of the specification, what they meant is forward in the one direction, the direction the airplane is going, not forward in the direction the propellers are spinning. Similarly here, just like there they were saying axial, not longitudinal, we're saying longitudinal, not axial. It's just the opposite. There is nothing in this specification that suggests that the patentee intended to capture that notion. In fact, it's interesting. The 204 parent application, which is the source in the center of the balloon. In that parent, what everybody would agree was asymmetric, according to Judge White's definition, the paradigm case of asymmetric. The word asymmetric doesn't appear. Symmetry and asymmetry don't appear in the context of the term as construed by Judge White. And interestingly, the Ashpole reference, the very old reference upon which the jury primarily invalidated this claim, is cited in that case, but not in this case. The reason is simple, or at least one reason is simple, because the notion of asymmetry of this takes Ashpole out of the claim. Properly construed, Ashpole isn't invalidating. Improperly construed, essentially every piece of prior art for the last 60 years invalidates this limitation, because by definition, as you're sliding the radiation source down the catheter, it's asymmetric, asymmetric, asymmetric. Boom, there's a moment in time. If you put it in the very center of the balloon, it's symmetric. And then you can just keep going. There's no invention there. The invention is moving the source off the central loom. And unless the court has further questions, I reserve the rest of my time for rebuttal. OK. Thank you, Mr. Wood. Mr. Shanmugam. Thank you, Judge Newman, and may it please the court. In our view, two basic principles of claim construction govern this case. First, the principle that a court should give the words of a claim their ordinary and customary meaning. And second, the principle that a court should not import a limitation into the claim from the specification or prosecution history. Isn't there a principle that a claim should be interpreted in light of the specification? Well, that's true, Judge Lurie. And you asked my friend, Mr. Wolf, whether this was a case in which the claim was ambiguous, but the specification was clear. We would respectfully submit that it's exactly the other way around here, that the claim is clear and that the specification is at most ambiguous on the central question of the point of reference for asymmetry. So let me start with the language of the claim. And then with the court's leave, I'll turn to the specification. As to the language of the claim, we really believe that the plain language of Claim 1 dictates the district court's construction here. We're happy for purposes of the argument to accept Halogic's premise that asymmetry is a relative concept that requires a point of reference. But Halogic, we respectfully submit, simply ignores the fact that Claim 1 itself supplies that point of reference. And the relevant language is on page 84 going on to page 85. And Claim 1 contains the two references to asymmetry. Claim 1 defines the asymmetry of the isodose curves with respect to the apparatus volume. And it further defines the asymmetry of the radiation source with respect to the expandable surface. And in our view, it necessarily follows that with regard to the isodose curves, asymmetric isodose curves are curves that are not substantially uniform in every direction. That is- Mr. Shanmugam, I'm looking at the specification. Summary of the invention. Asymmetrically placed with respect to a longitudinal axis. In another example, it then points out two more instances where it relates to the longitudinal axis. One then goes to Column 5, the radiation source has an asymmetrical configuration with respect to the longitudinal axis. When we go to Column 7, longitudinal axis, at least twice, basically the specification has the longitudinal axis all over it. Well, with respect, Judge Lurie, I think that the specification really contains references pointing in both directions. I'd like to respond- Could you point out the- Sure. And I'd like to respond both with regard to the early parts of the specification and then with regard to the discussion of the preferred embodiments, because I think there's language in both sections that supports the construction that, in our view, is mandated by the plain language of the claims. With regard to the background of the invention and the summary of the invention section. In the background of the invention section, the specification describes the need to deliver radiation in such a way as to protect sensitive tissue, and that's the language in the last paragraph of Column 2 on page 81 of the Joint Appendix. In the first paragraph of the summary of the invention, the specification goes on to state that the present invention addresses that need by delivering radiation in a, quote, asymmetric fashion. That's language in lines 57 and 58. Now, to be sure, in the summary of the invention section, the specification then goes on to that in particular examples, that can be done by delivering radiation asymmetrically with respect to the longitudinal axis. But the critical point, in our view, is that this invention states that the whole purpose of this invention was to deliver radiation asymmetrically. That was the claimed innovation here. And it was an innovation at least with regard to the predecessor patents as to which this application was a continuation in part. Because there's really no doubt the two predecessor patents, the 813 and 204 patents, both disclosed symmetric dosing, that is, dosing that is concentric with the outer balloon. This invention claims to be innovative precisely because it delivers radiation asymmetrically. Now, in fact, that was not an innovation because, as Mr. Wolf points out, devices delivering radiation asymmetrically had been known in the prior art for a number of decades. But the background of the invention section here notably doesn't disclose any of that prior art with the exception of one reference to ash bowl that was contained in one of the predecessor patents. Or does the specification disclose any instances of radiation that is asymmetric with respect to an other than longitudinal axis? Well, with respect, Judge Lurie, I would disagree. And to get to the discussion of the preferred embodiments, we really do think that figure three belies the argument that Hologic is advancing today, at least as to the radiation source in figure three, the planar source that is depicted in the figure. Hologic concedes at page 51 of its brief that that source is symmetric with respect to the longitudinal axis. Isn't that a two-dimensional drawing of a three-dimensional object? Well, that's correct. But nevertheless, notwithstanding the fact that the source is planar, Hologic says that under its construction, the source would be symmetric with respect to the longitudinal axis, even though they now take the position that, at least as to the isodose curves, they are asymmetric with regard to the longitudinal axis, which was contrary to the testimony offered by Dr. Verhey, their witness at the claim construction stage of proceedings. But the critical point is that as a result of that concession, Hologic concedes that figure three would not be covered by claim one under their construction. Now, of course, that's not dispositive of the argument here, but we believe that it's significant because it really belies the proposition that the specification uniformly teaches radiation sources that are asymmetric with respect to the longitudinal axis. Now, to be sure, we would concede that the embodiment depicted in figure one is asymmetric with respect to the longitudinal axis and the language to which Hologic points in the corresponding section of the description certainly confirms that proposition. But of course, the mere fact that one of the embodiments depicted in the specification happens to contain that feature is hardly a basis for reading that limitation into the corresponding claim language. And of course, with regard to the claim language, we rely not only on the fact that claim one itself contains express reference points, really with regard to both the radiation source and with regard to the isodose curves, but also the fact that two other claims contain the longitudinal axis limitation expressly, thereby confirming the common sense proposition that when Hologic intended to include that limitation, it in fact did so. The specification is entirely consistent with that proposition. And nowhere in the specification is there either an explicit or implicit definition of asymmetric to mean asymmetric with regard to the longitudinal axis. I would just make one further point with regard to the claim language. Nowhere in Hologic's brief, and I don't understand my friend Mr. Wolf to be suggesting otherwise at argument today, do they make the argument that every reference to asymmetry in this entire patent means asymmetry with regard to the longitudinal axis. And I think that that's really telling because it would be quite odd for the purpose of the device to have been simply to address situations in which the target tissue happens to be off  And it's not at all. I think that's an important point. And I do want to return to the question Judge Lori asked, if you can direct us to, we've got specific references to longitudinal axis where it says, however, that's not the only kind of asymmetry. Well, sure. Well, first of all, I would point to the language that I cited earlier at the end of the background of the invention section starting online. But that doesn't say it doesn't have to be the longitudinal axis in the general statement. Well, it's a general statement. That's right. And then in the first paragraph of the summary of the invention section, it goes on to state that the need that's described in the background of the invention section is addressed by delivering radiation in an asymmetric fashion without the longitudinal axis limitation. Oh, I thought there was nothing to add then to what you've already told us. Well, no, there is more. And there are the passages, which I believe we cited in our brief, but to take two examples in column three, in this recitation of various examples, there are particular examples that contain the longitudinal axis limitation. But starting at line seven, the specification states, in another example, the radiation source comprises a plurality of space-to-part solid radioactive particles disposed within the apparatus volume and arranged to provide a predetermined asymmetric isodose curve within the target tissue, another place where the longitudinal axis limitation. Then it follows that with two from the longitudinal. That's right. And again, that's to suggest that at most this is a case in which there are six of one and a half dozen of the other. I would note as well, with regard to the discussion of the preferred embodiments, that the longitudinal axis limitation is also nowhere found in the two paragraphs that correspond with figure three, the paragraphs in column six, starting at line 31, in which the specification really expressly talks about situations in which you can have asymmetric dosage in a three-dimensional space. It posits a hypothetical, for instance, in which you have the radiation source from figure three, but you add a further particle above the planar source. And it says that's one way of achieving dosage that is not symmetric in all directions, because then the dose would be asymmetric in the direction below the plane. So that really confirms our construction of figure three. And again, we think that figure three is really worth a thousand words here, because it belies the proposition conclusively that this specification uniformly teaches asymmetric radiation sources with respect to the longitudinal axis. So we should ignore figure 3a? Well, figure 3a really goes with figure three, and it simply illustrates cross-sectionally what figure three is doing. Now, under our construction, figure three would be covered by claim one, because we believe that the source is asymmetric precisely because it is a planar source. We also believe that the resulting isodose curves would be asymmetric really for the same reason. And so this is not a circumstance under which we're by any means suggesting a construction that would somehow leave figure three out of the picture entirely for purposes of this patent. It would clearly be covered by the construction that the district court adopted. And so this really is not a case in which, in our view, the specification somehow implicitly in a narrower fashion. And again, to get back to Judge Friedman's question to my friend, Mr. Wolfe, this is a circumstance in which the inclusion of this limitation in the other claims is really telling. I want to say just a word about the prosecution history, because Hologic relies on the prosecution history quite heavily in its brief. Hologic relies entirely on the discussion of the McGrath reference in the prosecution history. But we really don't believe that the McGrath reference is relevant for two reasons. First, the patent examiner, in distinguishing Claim 1 over McGrath, in no way relied on McGrath's ability to deliver radiation asymmetrically, and quite to the contrary, the examiner rejected Claim 1 over McGrath on other broader grounds. And accordingly, in responding to the office action rejecting Claim 1, the applicants in this case in no way came forward and said, look, Claim 1 actually discloses asymmetric dosing with respect to the longitudinal axis. Instead, they distinguished McGrath on broader grounds as well. They argued first that McGrath was a device that was being used in a natural body cavity rather than in a surgical or interstitial cavity, and second, that the radiation source in McGrath was not located completely within the disclosed balloon. So as with the specification, we really don't believe that the prosecution history contains the kind of clear indication of the applicant's intent that would be required to overcome the language of the claim. I just want to make one further point about our alternative grounds for affirmance here. We make arguments in our brief that the judgment in our favor can be affirmed both on grounds of anticipation and inoperability. I'd really rely on the brief alone, unless the court has any questions, for purposes of our argument on anticipation. With regard to inoperability, we really don't believe that the language in question with regard to inoperability can be saved by a judicial construction. The language in question is the language that requires that the radiation source be spaced apart from the apparatus volume, but that language really does claim an impossibility because it would require the radiation source to be spaced apart from the very volume in which it is contained. The district court attempted to cure that problem by redefining apparatus volume as the expandable outer surface in its expanded or configured state, but in so doing, the other language in Claim 1, nonsensical, because that other language in Claim 1 makes clear that apparatus volume and expandable outer surface are discrete claim terms with distinct meanings, and indeed the language of other claims, and in particular Claim 9, really confirms that those two terms had very different meanings for purposes of this patent. And so we would respectfully submit that Judge White made an error in that regard by contravening the fundamental principle that a court cannot rewrite a claim in order to save its validity because the very purpose of claim language is to provide the public with notice of the claim's scope. And so even if this Court were to disagree with Judge White's construction of the central claim terms at issue here, and we would respectfully submit that those constructions were correct, it should nevertheless confirm the judgment below. Thank you. Thank you, Mr. Shanmugam. Mr. Ward? Thank you, Your Honor. I'm going to go roughly in order of the patent as opposed to order of the arguments, if you will indulge me. At the top of Column 3, counsel pointed out the phrase, in another example, the radiation source, et cetera, and it talks about asymmetry without specifying what kind of asymmetry, but of course that's the genus of the embodiments it's talking about. The very next sentence begins the discussion of the species within that genus, and it says, in one particular example, the plurality of space-to-part radioactive particles are provided on a single elongate member that is shaped so that some of the radioactive particles are farther from the longitudinal axis. So the very sentence that he suggested, that counsel suggested, somehow offered another understanding of asymmetry was saying, here's a genus of asymmetric embodiments, now let's talk about the species, and every species they talk about is with respect to the longitudinal axis. If you're proceeding, the first sentence describes a genus. Without specificity as to the reference point. If it's a genus, that's what the claim is directed to. Your Honor, I'm using it loosely, but that doesn't change what we're trying to construe a word here. We're trying to understand what the word asymmetry means. So what you really mean is it's not a genus. If that's a buzzword for you, I really mean it's not a genus, Your Honor. It's a vague word. It is a word saying, here's another category of embodiments, now let's describe what the members of that category are. And every member of that category, indeed every time, again, I would agree with everything counsel is saying if there were examples in the specification, even one example in the specification, where asymmetry, where that term was used to mean north or south in the longitudinal axis. And I'll get to his example in figure three in a moment. Counsel might have misspoke when he said the preferred embodiment, figure three, is excluded. Well, the preferred embodiment, in fact, the embodiment embodied in claim one is figure one. And this is what the patent says. This is at column four, lines 58 to 60, about figure one. Radiation source 24 comprises a wire of 34 having one or more solid radioactive particles located in the wire. And then it goes on to say that in each instance, it's asymmetric with respect to the longitudinal axis. There is no suggestion that the preferred embodiment has any meaning for asymmetry other than with respect to the longitudinal axis. You said you defer comment on figure three. That seems to be the most difficult problem and the clock is ticking. Why don't you get to that? Surely. And let's focus in particular on column six, lines 48 through 51. And I believe this is what counsel was referring to when saying you could add a source. It says, for example, an additional source could be added, for example, above plane 62 to result in a symmetric isodose profile in all directions except the direction below the plane 62. So in other words, an asymmetric profile, symmetric in some respects, but not in others. Well, if you look at figure 3A, remember, we're looking head on on the catheter here. It's kind of difficult to conceptualize. But above or below the plane means off the longitudinal axis. That central picture, the central circle in figure 3A, that's the longitudinal axis. And there's a chain of sources. So when they're talking about adding sources to make an asymmetric dose, they're explicitly saying it's off the longitudinal axis. There is not a suggestion anywhere in this patent that you can affect the symmetry of either a dose or a source by moving it along the longitudinal axis or adding it to the longitudinal axis or a dummy train. There's nothing. So figure 3, let's focus on the source of figure 3. It says it's asymmetric, figure 3A. And it's focused on it exactly with respect to the longitudinal axis. So figure 3 reinforces our point that when they're using the term, they mean what's happening away from the longitudinal axis. Again, it would have been trivial to take the 204, the parent, and as you're putting the seed in, just stop it before you got to the center. If that's what they meant by asymmetry, they would have said so in the parent, and they certainly wouldn't have made a big deal out of the invention. And at trial, CENTER-X wouldn't have conceded that it was such a big deal to move a source off the central limit. Thank you very much for your time. Thank you, Mr. Wilk, and thank you, Mr. Sheldon, again, because it's taken on your submission.